**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PAUL DOCKERY,

      Plaintiff,                        Case No. 08-13249
                                          Hon. Gerald E. Rosen

v.

USG CORPORATION RETIREMENT
PLAN, a foreign entity,

      Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING CROSS-MOTIONS TO REVERSE OR AFFIRM
<u>DENIAL OF DISABILITY RETIREMENT BENEFITS</u>**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 11, 2009_____

PRESENT:   Honorable Gerald E. Rosen
Chief Judge, United States District Court

## I.  <u>INTRODUCTION</u>

In this suit, Plaintiff Paul Dockery challenges the decision of the defendant claims

administrator, USG Corporation Retirement Plan, to deny him disability retirement

benefits under a plan sponsored by his employer, USG Corporation.  This Court's subject

matter jurisdiction rests upon Plaintiff's claim for benefits under an employee welfare

benefit plan governed by the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 *et seq.*

The case is presently before the Court on cross-motions to affirm or reverse the Plan's decision on the administrative record.  The parties agree that the "arbitrary and capricious" standard governs this Court's review of the challenged decision, although they disagree somewhat as to the degree of deference owed to Defendant under this standard.  Nonetheless, Plaintiff maintains that the Plan's decision must be overturned even under a deferential standard of review, where (1) Defendant purportedly disregarded the opinions of Plaintiff's treating physicians and (2) Defendant improperly relied on the opinions of unqualified independent medical examiners and a selective review of the medical evidence.

The parties' cross-motions now have been fully briefed and are ready for decision. Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs," see Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan, following the guidelines set forth by the Sixth Circuit in Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609, 619 (6th Cir. 1998).[1]  This opinion and order sets forth the

---

[1]  Specifically, Wilkins holds that neither summary judgment nor a bench trial provides an appropriate procedural basis for resolving ERISA actions to recover benefits. Rather, the Sixth Circuit suggested that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly."  Wilkins, 150 F.3d at 619.

2

Court's findings of fact and conclusions of law.  To the extent that any findings of fact

constitute conclusions of law, they are adopted as such.  To the extent that any

conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

On August 12, 1976, Plaintiff Paul Dockery began working for USG Corporation.

He eventually became a general manager and foreman of the company's drywall line.  He

stopped working, after 31 years of service, on July 30, 1997, primarily as a result of hip

problems.  As an employee, Plaintiff was eligible for coverage under the corporation's

employee pension benefit plan, Defendant USG Corporation Retirement Plan (the

"Plan").  The Plan is a retirement plan sponsored by USG Corporation ("USG") and

funded under the USG Corporation Master Investment Trust from both employer and

employee contributions.  It is administered by The Pension and Investment Committee

(the "Committee"), a claim fiduciary and Plan designee.

**A.      The Pertinent Plan Provisions**

Under the Plan, an eligible employee is entitled to receive monthly disability

retirement benefits, subject to the conditions and limitations of the Plan, "if a participant

is retired on a disability retirement date because of total and permanent disability."  (Plan

at 30; Admin. Record ("AR") at 71.)[2]  The Plan further states:

---

[2]  A participant's "disability retirement date" is the first date of the calendar month
following the month in which the participant is retired because of total and permanent
disability.  Disability retirement benefits are only available to employees who have
completed ten years of credited service for the company.  (Plan at 13; AR at 54.)

> A participant will be considered to be totally and permanently disabled for the purposes of the plan if the participant is unable to engage in any substantially gainful activity by reason of a medically determinable physical or mental disability which has existed for six continuous months and which can be reasonably expected to continue for at least 60 additional months or result in death.

(Plan at 31; AR at 72.)  The Plan vests responsibility for determining whether a participant has incurred a total and permanent disability, for purposes of approving payment of any disability retirement income, in the Committee.  (Id.) The Committee may require "reasonable proof" of such disability.  (Id.)  The Plan does not define what constitutes an employee's "substantially gainful employment."  The summary plan description states: "In general, total and permanent disability means you have been disabled for at least six months and will be unable to work for the rest of your life." (Summary Plan Description at 21; AR at 196.)

Under the Plan, the Committee possesses the authority "to determine in its discretion all questions arising under the Plan, including the power to determine the rights or eligibility of employees or participants and their beneficiaries and the amount of their respective benefits under the Plan, and to remedy ambiguities, inconsistencies or omissions."  (Plan at 77; AR at 118.)  Subject to applicable law and the provisions of the Plan governing benefit determinations, any interpretations of the Plan and any decision on any matter within the Committee's discretion must be made in good faith and shall be binding on all persons.  (Plan at 79; AR at 120).  During the claim review process, both USG and persons claiming benefits under the Plan are required to furnish such evidence,

4

data or information as the Committee considers necessary to administer the Plan. (Plan at

79; AR at 120.) The Committee must provide notice in writing to any Plan participant

whose claim for benefits under the Plan is denied, and in the case of denial, the

Committee must also afford the participant a "full and fair review of its decision, if so

requested." (Plan at 79; AR at 120.)

## B.    Plaintiff's Pertinent Medical Treatments

Plaintiff's claim for disability retirement benefits stems from degenerative spinal

and hip problems and chronic pain that began in early spring 2002. The medical records

relevant to this case document a period of approximately six years, during which Plaintiff

complained, off and on, of these conditions. On April 30, 2002, Plaintiff sought

treatment for hip pain and difficulty walking with Dr. Thimmiah Ramesh, his primary

care physician. (AR at 230.) Plaintiff also complained of neck and back pain radiating to

the front of his chest. (Id.) Dr. Ramesh began treating these conditions with prescription

medication and injections, alongside prescriptions to control Plaintiff's high blood

pressure. (AR at 229-30.) An x-ray of Plaintiff's right hip conducted on May 1, 2002

revealed mild early osteoarthritic changes. (AR at 256.)

In June through December 2002, Plaintiff sought treatment with Dr. Henri M.

Pierre-Jacques, an orthopaedic specialist. (AR at 266-70.) Plaintiff told Dr. Pierre-

Jacques that he experienced hip pain and pain radiating to his extremities, which

interfered with his daily activities. (AR at 269.) Although Plaintiff's lower back pain

resolved over this period as a result of a course of treatment including medication and

5

injections, he continued to complain of localized hip pain. (Id.)  Dr. Pierre-Jacques noted that Plaintiff had limited range of motion when raising his leg, but that Plaintiff's condition responded to the medication prescribed by Dr. Ramesh.  (Id.)  He prescribed an injection of the right hip under fluoroscopy, which improved Plaintiff's symptoms.  (AR at 267.)  By December, Plaintiff was reported to have "good range of motion without instability"; Dr. Pierre-Jacques recommended continued observation and noted that Plaintiff was a candidate for future arthroplasty.  (AR at 266.)

In February 2003, April 2004 and August 2004, Plaintiff continued to report right hip pain to Dr. Ramesh, though his lower back pain reportedly improved.  (AR 226-28.)  Dr. Ramesh prescribed Celebrex to treat osteoarthritis and Plaintiff indicated that it helped his symptoms.  (AR at 227.)  In August 2004, Dr. Ramesh also prescribed Motrin 800 for Plaintiff's pain.  (AR at 226.)  Dr. Ramesh's medical files for Plaintiff, barely legible, then appear to include a period of nearly two years during which Plaintiff reported "doing better," though he also reported other unrelated ailments.  (AR at 225.)  In an appointment on August 15, 2006, Plaintiff again reported back pain to Dr. Ramesh, apparently triggered by working on his car.  (AR at 224.)  He also complained of hip pain and was prescribed Flexeril, a muscle relaxant.  (AR at 224.)  In subsequent visits, Plaintiff reported that his back pain improved though he continued to experience hip pain.  (AR at 223.).

By July of 2007, Plaintiff's hip and back pain had returned: he complained of trouble walking and trouble sleeping.  (AR at 222.)  At the referral of Dr. Ramesh,

6

Plaintiff sought treatment with Dr. Lawrence Morawa, an orthopaedic surgeon. (AR at 343.) Dr. Morawa had previously treated Plaintiff for a spine problem. (Id.) He noted the marked decrease in the range of motion of Plaintiff's hip and indicated that Plaintiff had "significant degenerative disc disease at L5-S1 compatible with wear and tear in the area." (Id.) Plaintiff reported to both Drs. Ramesh and Morawa that his hip pain had gotten worse and that he experienced a "significant amount of pain in his right groin area." (AR at 220, 343.) Dr. Ramesh prescribed Vicodin in lieu of the pain medications previously prescribed. (AR at 220.) Dr. Morawa recommended hip replacement surgery, which Plaintiff ultimately agreed to pursue in August 2007. (AR at 343.) During this period, Plaintiff also began to complain of feeling "nervous and uptight." (AR at 221.) His last day of work for USG was July 30, 2007, when Plaintiff stopped active employment to undergo full treatment for his hip problems.[3]

On September 18, 2007, Plaintiff underwent total hip arthroplasty. (AR at 352.)

_____

[3] The Plan's Motion For Entry of Judgment on the Administrative Record notes that Plaintiff began receiving disability benefits under USG's long-term disability welfare plan when he stopped working July 30, 2007:

> Dockery was considered eligible for such benefits because it was determined that he could no longer fulfill the duties of his own job that he performed prior to ceasing active employment. Dockery will be eligible to continue long term disability benefits for 24 months, at which time Dockery will need to prove that he cannot fulfill the job duties of *any* occupation—a test similar to that in the Plan in order to be eligible to receive disability retirement benefits.

(Def.'s Mot. for Entry of J. on the Admin. R. 20 n.5.)

7

Hospital records indicated that the replacement was in good position after surgery and that his pain was controlled.  (Id.)  He was able to walk, assisted by a cane, and undergo physical therapy in the following days and weeks.  (Id.)  In a follow-up appointment with Dr. Morawa on October 4, 2007, Plaintiff reported that he was "very happy with his overall results," and that the pain was gone.  (AR at 343.)  During further follow up on October 18, 2007, Plaintiff indicated again that he was happy with his results but that he continued to take "a little Vicodin" for pain.  (AR at 342.)

In October 2007 through January 2008, Plaintiff began to report severe back pain and neck pain that radiated down to his feet to his primary care physician.  (AR at 216-19.)  At a visit with Dr. Ramesh on November 1, 2007, Plaintiff also reported feeling "depressed."  (AR at 218.)  Dr. Morawa documented that Plaintiff had "problems totally unrelated to his hip."  (AR at 342.)  In November 2007, Plaintiff underwent a cervical and lumbar MRI, which revealed the following conditions:

- C3-C4: Left neural foramen disc spur complex with mass effect on the cord and narrowing of the left neural foramen. No central stenosis is seen.

- C4-C5: Broad-based posterior osteophyte with mass effect on the cord and neural foraminal narrowing bilaterally.  No central stenosis is seen.

- C5-C6: Central disc herniation with mass effect on the cord and narrowing of the left neural foramen.

- C6-C7: Left paracentral disc herniation with mass effect on the cord and narrowing of the left neural foramen.

- L1-L2: Bilateral facet degenerative changes with no evidence of spinal stenosis.

- L2-L3: Bilateral facet degenerative changes. No evidence of spinal stenosis.

- L3-L4: Bilateral facet degenerative changes and diffuse disc bulge. No evidence of spinal stenosis.

- L4-L5: Diffuse disc bulge, central disc herniation, and bilateral facet arthritis. No evidence of spinal stenosis.

- L5-S1: Central disc herniation.

(AR at 237-38.)  An MRI of Plaintiff's thoracic spine performed a month later also revealed "a small central disc protrusion at the T3-T4 level."  (AR at 239.)

In November 2007, Dr. Ramesh referred Plaintiff to Dr. Norbert Roosen, a neurosurgeon, in response to Plaintiff's complaints about ongoing neck and back pain, and to Dr. Pawan Garg, a psychiatrist, in response to Plaintiff's depression.  (AR at 217-18.)  In his evaluation of Plaintiff, Dr. Roosen noted that Plaintiff had "good range of motion," though he experienced "pain with flexion, extension, and left lateral rotation." (AR at 261.)  Dr. Roosen did not recommend any surgical intervention, but instead recommended "physical therapy, physiatry, pain medication, and possibly the pain clinic for injections."  (Id.)  Plaintiff was referred for treatment at the Oakwood Heritage Pain Clinic.  (AR at 217.)  Meanwhile, Dr. Garg began treating Plaintiff for "severe major depression with severe anxiety."  (AR at 363-67.)  Plaintiff was prescribed Zoloft.  (AR at 217, 363-67.)

## C.    Plaintiff's Claim for Disability Retirement Benefits

On January 23, 2008, Plaintiff applied for long-term disability with MetLife and

9

disability retirement benefits under the Plan.  (AR at 292-305.)[4]  In his disability

retirement benefits application to the Plan, Plaintiff listed his reasons for disability as

"degenerative spine, multilevel disc herniations, osteophytes and degenerative changes,

chronic pain, severe depression and hypertension."  (AR at 292.)

    Dr. Ramesh prepared a letter "To Whom It May Concern" in January 2008, in

which he stated:

> [Plaintiff] has been known to me for many years.  He has been treated for
> Hypertension.  Patient has been complaining of neck, back, and right hip
> pain off and on for 2 years that has been getting worse.
>
> The neck pain radiates to his left shoulder, left arm and fingers.  The pain
> feels like burning numbness.  He also has low back pain and pain in
> between his shoulder blades.  He rates his pain 10/10.  Patient had a MRI on
> his Neck, Thoracic, and Lumbar region.  It showed evidence of <u>Multilevel
> Disc Herniation, Osteophytes, and Degenerative changes</u>.
>
> Patient has been severely depressed secondary to pain.  Patient underwent
> Right Total Hip Arthroplasty recently.  Dr. Rosen [sic] saw patient in
> Neurosurgery clinic.  Advised Physical Therapy, Physiatrist, paind
> medication and pain clinic for possible injection.
>
> A Pyschiatrist confirmed the patient's Major Depression.
>
> <u>Patient is totally disabled</u>.

---

[4]  In the pleadings, Plaintiff noted that MetLife approved Plaintiff's request and
has been paying him benefits without issue.  He also pointed out that in July 2008, on his
initial application, the Social Security Administration determined that Plaintiff was totally
and permanently disabled—precluded from performing any substantial gainful
activity—and awarded him social security disability benefits.  These determinations do
not appear to have been available to the Committee when it reached its decision and there
is no documentation for either in the administrative record, beyond Plaintiff's initial
application materials to MetLife.

(AR at 306) (emphasis in the original).  Dr. Garg, Plaintiff's psychiatrist, also submitted a letter, which stated only that Plaintiff is "currently under my care for Severe Major Depression.  His Depression is related to severe medical problems and Chronic pain and that [sic] he is disabled to work."  (AR at 307.)

On February 8, 2008, Tamra Kucera, a USG employee benefits manager, submitted the "relevant medical information," to Dr. Shirley A. Conibear, an independent medical examiner with Occupational Medicine Specialists, Ltd.  (AR at 28.)  Dr. Conibear received her doctorate in medicine from the University of Illinois College of Medicine in 1973 and a Masters of Public Health degree from the University of Illinois. (AR at 18-27.)  She is board-certified in occupational medicine and is a certified Medical Review Officer ("MRO") and a board-certified Independent Medical Examiner ("CIME").  (Id.)

On February 14, 2008, Dr. Conibear issued a written report denying Plaintiff's application.  Her report summarized Plaintiff's medical records:

- Dr. Ramesh, Plaintiff's primary health care provider, stated in a January 21, 2008 letter that "Mr. Dockery has worsening neck, back and right hip pain off and on for two years. This has caused severe depression. Mr. Dockery had a right hip arthroplasty recently. He saw Dr. Rosen [sic], neurosurgeon, who has recommended physical therapy, pain medication and pain clinic for evaluation for injection in his lumbar spine. Dr. Ramesh stated that Mr. Dockery is 'totally disabled.' [Dr. Ramesh gave] [n]o prognosis for recovery and no restrictions or limitations were listed."

- Dr. Garg, Plaintiff's psychiatrist, wrote in a January 21, 2008 letter "that Mr. Dockery is under his care for Severe Major Depression related to his severe medical problems and resulting pain, and that

11

Dockery is 'disabled to work.' [Dr. Garg gave] [n]o prognosis for recovery and no limitations or restrictions were listed."

• Dr. Morawa, Plaintiff's orthopedic specialist, examined Plaintiff on July 25, 2007 related to "pain in his right groin, a limp and limited motion in his right hip. According to Dr. Morawa's notes, "neurological exam [results] including strength [analysis] were normal."

• "Right hip replacement surgery was done on Sept 18, 2007. [Progress notes from after the surgery stated that Plaintiff] was said to be doing very well on Oct. 18, 2007 and was walking with only a cane for support. He was taking only a little Vicodin [for his pain and] his range of motion was 'improved.'"

• A physical therapy note from October 2, 2007 stated that Plaintiff's "balance was good and he could walk continuously for 100 feet on uneven surface, stair climb with handrail for 20 steps and could walk down a flight of stairs using handrails. . . . He was still improving post hip surgery."

• A November 1, 2007 office note states Plaintiff "needed evaluation of his neck and low back due to 'problems unrelated to his hip.'"

• A November 5, 2007 MRI of Plaintiff's lumbar and cervical spine "showed narrowing of the left neural foramen [and] central disc herniation . . . . Cord signal was normal throughout. [The] lumbar spine showed bilateral joint degenerative changes with no evidence of spinal stenosis [in the upper lumbar region] and disc herniations [in the lower lumbar region]."

• On December 5, 2007, Plaintiff was treated by Dr. Ramesh. Plaintiff's neck pain was described as "comes and goes" over the past two years and worse "recently."  Plaintiff also reported lower back pain that "comes and goes" with radiating pain into his right leg and foot. "It was 10/10 in severity at times.  Activities such as bending, lifting, walking and sitting caused symptoms.  He had not had any treatment for his neck and back pain at this time.  It was noted that he had been off work since August due to hip surgery. Physical exam showed that he walked steadily with a cane.  He had decreased sensation throughout the left upper limb but 5/5 strength

12

and normal reflexes.  Right legs showed some weakness referent to the hip and diffuse decreased sensation in a non-dermatomic pattern. No surgery was recommended. [But treatment with physical therapy,] pain clinic with meds and possible injections were recommended."

• A December 27, 2007 MRI of Plaintiff's thoracic spine showed a "small central disc protrusion at T3-4."

(AR at 29-30.)  Dr. Conibear then went on to conclude that Plaintiff did not qualify as totally and permanently disabled under the Plan.  (AR at 30.)  Specifically, she summarized Plaintiff's conditions as: (1) a psychiatric condition that had not existed for six months and showed no indication that "it was likely to continue at the current level for another sixty months"; (2) hip problems following Plaintiff's hip replacement surgery that were "not expected to cause total permanent disability from any gainful employment as required by the Plan"; and (3) degenerative arthritis of the cervical and lumbar spine, which Dr. Conibear considered a "treatable condition," which "does not meet either the Plan's period of duration or the expected period of continuation."  (AR at 30-31.)

By letter dated March 10, 2008, the Committee denied Plaintiff's claim on.  (AR at 16-17.)  The letter of denial directly quoted Dr. Conibear's findings, before concluding that Plaintiff was not totally and permanently disabled.  (AR at 16.)  During this period, Plaintiff continued to seek medical treatment from Drs. Ramesh and Garg, as well as from Dr. Nilesh Patel of Michigan Orthopedic Specialists and Dr. Hussein Huraibi of the Michigan Institute of Pain Management, at Dr. Ramesh's referral.  (AR at 214-15, 280-89, 359-62.)

13

**D.      Plaintiff's Appeal from the Committee's Denial**

Upon learning of the denial, Plaintiff contacted Ms. Kucera on or about March 20, 2008, to inquire about the Plan's claims review process and correct a misunderstanding he had with USG about how his disability retirement application should be submitted.  (AR at 15.)[5]  Ms. Kucera memorialized their conversation in a letter to Plaintiff the following day:

> You were under the impression that our corporate medical director would be reaching out to your doctors to obtain medical documentation and that you only submitted some partial documents that you happened to have in your possession.  You felt that you may have been rushed along in submitting your application because [my predecessor] was ending her employment with USG and she wanted to make sure your application was submitted prior to her departure.

(Id.)  On April 14, 2008, Plaintiff sent a letter to Ms. Kucera, requesting a review of the Committee's March 10, 2008 decision.  (AR at 14.)  In his claim appeal letter, Plaintiff argued that the claim determination, which focused on his hip replacement, did not address his biggest health concerns.  (Id.)  Specifically, he claimed that his other hip was getting worse and that he continued to experience "degeneration in [his] spine and other joints, along with . . . chronic pain, panic attacks, and depression."  (Id.)  He explained that his physicians can only treat the symptoms of these conditions, but that they are not ultimately curable.  (Id.)  In addition to expressing his gratitude to USG and his co-

---

[5]  Specifically, Plaintiff claims that an employee in USG's human resources department  told him that certain medical information, such as radiologic films and/or studies, was not necessary to submit to the Committee as evidence of total and permanent disability.

workers for their "help and accommodation" over the preceding five years "with this
progressive debilitating disease," Plaintiff submitted additional medical records from his
treating physicians.  (Id.)  These included two medical reports that post-dated the
Committee's initial claim denial regarding ongoing treatment during the claim review
process: (i) a report from Dr. Patel dated April 1, 2008, in which Dr. Patel recommended
that Plaintiff have back surgery to repair his herniated discs in his cervical spine and that
he receive lumbar epidural steroid injections to treat his lumbar problems (AR at 359-62);
and (ii) a report from Dr. Huraibi dated April 3, 2008, in which Dr. Huraibi examined
Plaintiff related to his lumbar back pain and recommended that Plaintiff undergo
therapeutic epidural steroid injections for his lumbar pain followed by physical therapy.
(AR at 280-89.)  Dr. Huraibi stated that Plaintiff's problems with his cervical spine were
being treated by Dr. Patel.  (AR at 281.)  He noted that "the risk of complications and
morbidity of chronic/acute pain, if left untreated, . . . may lead to long-term disability."
(Id.)  Plaintiff admits that he has declined to have the back surgery recommended by Dr.
Patel. (AR at 280-89; Complaint ¶ 27).

The Plan sent Plaintiff's original application and the additional records to Dr. Raja
K. Khuri, a second independent medical examiner, also employed with Occupational
Medicine Specialists, Ltd.  (AR at 10.)  Dr. Khuri received his doctorate in medicine from
the American University of Beirut School of Medicine in 1961 and his Master of Public
Health degree from the University of Illinois in 1983.  (AR at 6-9.)  Dr. Khuri is board-
certified in Internal Medicine and Occupational Medicine and is also certified by the

American Board of Independent Medical Examiners ("ABIME").  (Id.)

Dr. Khuri ultimately concluded in a three-paragraph letter that Plaintiff did not qualify as totally and permanently disabled because:

> Some or all of the diagnoses cannot be reasonably expected to continue at the current level of severity for at least the next 60 months or result in death before the time period has elapsed.
>
> The employee is currently incapable of performing the duties of his job or of any gainful employment at this time.  However, treatment options at this time have not been exhausted.  If surgery is performed on his neck and is successful, he could well be able to seek gainful employment.
>
> Low back pain as a rule improves with time and barring a major change is not likely to last 60 months and preclude him from working. The major depression diagnosed by the psychiatrist is under treatment.  There is no evidence in the records provided that it is disabling.

(AR at 11.)  Dr. Khuri did not detail which records he reviewed.  (Id.)

After receiving and considering Dr. Khuri's independent medical opinion as well as the prior independent medical opinion expressed by Dr. Conibear, all medical records received from Plaintiff's physicians and the governing Plan documents, the Committee determined that Plaintiff was not totally and permanently disabled under the Plan's terms. On May 28, 2008, the Committee sent Plaintiff a written determination of his claim that cited Dr. Khuri's independent opinion that "there was not sufficient evidence in the medical record to support the conclusion that [Plaintiff's] disability is a total and permanent one." (AR at 3-5.)

This suit followed, with Plaintiff contending that the decision to deny his retirement disability benefits was arbitrary and capricious.   Specifically, Plaintiff argues

16

that the Committee wholly minimized the extent and nature of Plaintiff's spinal problems by stating that degenerative arthritis is a treatable condition and that the condition could reasonably be expected to improve with surgery.  In addition, he contests the opinions of both independent medical examiners, arguing that degenerative arthritis is not a condition amenable to successful, fully restorative treatment, and that the Committee cannot dictate a particular course of treatment, i.e., by conditioning a finding of total and permanent disability on his willingness to undergo back surgery.

### III. <u>CONCLUSIONS OF LAW</u>

**A.     The Standards Governing  the Parties' Cross-Motions**

A participant in or beneficiary of an ERISA qualified plan may bring suit in federal district court to recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies.  <u>See</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); <u>Wilkins v. Baptist Healthcare System, Inc.</u>, 150 F.3d 609, 613 (6th Cir. 1998).

Here, the parties agree that the "arbitrary and capricious" standard governs the Court's review, in light of the Plan provision that confers upon the claims administrator the authority "to determine in its discretion all questions arising under the Plan, including the power to determine the rights or eligibility of employees or participants and their

17

beneficiaries and the amount of their respective benefits under the Plan, and to remedy ambiguities, inconsistencies or omissions." (Plan at 77, AR at 118.) This standard is highly deferential: "A plan administrator's decision will not be deemed arbitrary and capricious so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston, 419 F.3d 501, 506 (6th Cir. 2005) (quoting Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990)). The Court must decide whether the Plan administrator's decision was "rational in light of the Plan's provisions." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988). Finally, the Sixth Circuit has explained that even if the standard is deferential, it is not "inconsequential." Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Id.

Plaintiff argues for the first time in his Motion for Judgment on the Administrative Record that the Court's deferential review should further be tempered by the existence of a conflict of interest, where the Plan is funded by a USG trust account. As this Court has explained elsewhere, while a plan administrator's possible conflict of interest does not warrant the outright abandonment of the "arbitrary and capricious" standard in favor of *de novo* review, the reviewing court nonetheless looks to see if there is evidence that the possible conflict in any way influenced the plan administrator's decision. Evans v. Unum

18

Provident Corp., 434 F.3d 866, 876 (6th Cir. 2006).

In support of his claim of a conflict of interest, Plaintiff argues simply that the Plan "is both the decider of benefits and the entity responsible for paying those benefits." (Pl.'s Mot. 24.)  He cites the Plan provisions that vest the Committee with the authority "to determine in its discretion all questions arising under the plan," and set aside funding for benefits in a trust of employer and employee contributions.  (Plan at 77; AR at 118.) He appeals to the reasoning set out in Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1026 (9th Cir. 2008), in which the Ninth Circuit concluded:

> even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion. . . . [E]ven though benefits are not paid directly by [the company], [it] obviously still has a financial incentive to keep claims' experience under the Plan as low as possible—the less the Trust pays out as benefits, the less [the company] will ultimately need to contribute to the Trust to maintain its solvency.

Burke, 544 F.3d at 1026.  Although the Court is not wholly persuaded that a plan funded by an independent trust raises the same conflict of interest concerns as in cases where the plan administrator is also the insurer, the Court nevertheless looks to see if there is evidence that the possible conflict in any way influenced the Committee's interpretation of "total and permanent" disability.

Finally, in reviewing Defendant's decision, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator."  Wilkins, 150 F.3d at 615, 619.  The pertinent record, however, is not limited solely to the evidence before the administrator at the time of its

19

initial decision, but also includes materials considered during the administrative appeals process.  Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991).

**B.    Defendant's Denial of Disability Retirement Benefits Was Arbitrary and Capricious, Where It Was Based On Hired Independent Medical Examiners' Conclusory Evaluations.**

With the above standards in mind, the Court now turns to the benefit determination at issue here.  In challenging the Plan's decision to deny his disability retirement benefits, Plaintiff principally contends that the Plan failed to give proper weight to the opinions of his treating physicians and the medical records, which indicated that he suffered severe spinal, sensory and motor deficits.  While Plaintiff asserts several other ways in which the Plan's decision-making process was flawed, the Court finds it necessary to address only this purported defect.  Specifically, the Court concludes that the Plan has failed to offer a reasoned explanation for its decision; rather, it appears to have relied exclusively on the opinions of hired independent medical examiners who in turn did not provide a sufficient basis for rejecting the opinions of Plaintiff's treating physicians.  A decision reached under these circumstances is deemed "arbitrary and capricious" under controlling Sixth Circuit precedent.

The administrative record provided the Committee with extensive evidence relating to Plaintiff's hip and spine conditions, as well as chronic pain, though it provided no definitive medical opinion regarding Plaintiff's long-term ability to work or his prognoses for recovery.  Two of Plaintiff's treating physicians described him as disabled to work or totally disabled.  In addition, the medical documents suggest that, while

20

Plaintiff was still recovering from hip replacement surgery, his back condition was worsening or recurring, causing radiating pain to his chest and extremities.  Meanwhile, Plaintiff continued to seek treatment for major depression and anxiety.  Taken together, the record indicates that Plaintiff suffered from several major medical conditions over the course of several years, which, although sometimes responsive to treatment, continued to affect his ability to sit, stand, and walk.  Solely on the basis of a file review, the independent medical examiners hired by the Committee concluded that Plaintiff had failed to show that he was totally and *permanently* disabled, under the terms of the Plan. The Committee in turn summarily adopted these conclusions, despite the fact that the examiners neither sought to address the treating physicians' view that Plaintiff is in fact disabled, nor fully explained the basis for their findings.

While the Supreme Court has expressly held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician," it has explained that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003); see also Eastover Mining Co. v. Williams, 338 F.3d 501, 510 (6th Cir. 2003).  In this case, even if the medical record did not conclusively indicate permanent disability, the Committee failed to fully address much of the contrary evidence in the record, substituting the conclusions of hired physicians instead.  The Court finds that this was an abuse of discretion where the independent medical examiner declined to

21

credit the diagnoses of Plaintiff's treating physicians without meaningful explanation. See Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296 (6th Cir. 2005) (finding abuse of discretion when administrator relies on opinion of physician who fails to explain basis for rejecting other physicians' conclusions); McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 170-71 (6th Cir. 2003) (holding that "[t]he mere possibility" of a particular conclusion, notwithstanding "overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny" a claim). Furthermore, while there is nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination, see Calvert, 409 F.3d at 296, here the independent medical examiners, particularly Dr. Khuri, provided scarce indication that they actually scrutinized the medical records.  Neither examiner contacted Plaintiff's treating physicians to discuss prognoses for long-term recovery or treatment options, despite the fact that those physicians had been treating him for several years. Finally, neither examiner conducted a physical examination.  See Kalish, 419 F.3d at 508 ("Whether a doctor has physically examined the claimant is indeed one factor that [this Court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

As a general rule, an administrator abuses its discretion when it engages in a "selective review of the administrative record" to justify a decision to terminate coverage. Moon v. Unum Provident Corp., 405 F.3d 373, 381 (6th Cir. 2005).  Here, even assuming that the Committee reviewed the entire administrative record, the decision-making

process is marred by how little effort was made to account for the extensive medical

documentation of Plaintiff's conditions.  Plaintiff presented considerable evidence

establishing multi-level degenerative disc disease, disc herniations, and osteophytes, as

well as chronic pain, severe depression and hypertension.  Based on the denial of benefits

letters and IME evaluations, it appears that the review improperly focused on the periods

in which Plaintiff's condition was responsive to some form of treatment—information

that *could* be read to support a denial of coverage—while failing to fully account for the

rest of the record.  See Metropolitan Life Ins. Co. v. Conger, 474 F.3d 258, 265 (6th Cir.

2007) (finding that plan administrator's decision-making process is not deliberate or

principled where it focuses on slivers of information in the medical record that could be

read to support a denial of coverage and ignores—without explanation—a wealth of

evidence that directly contradicted its basis for denying coverage).  The review

downplayed diagnostic and physical findings showing degeneration, limited movement

and chronic pain.  Finally, and perhaps most troubling to the Court, is Dr. Khuri's facile

conclusion that "treatment options have not been exhausted" and that back surgery could

return Plaintiff to gainful employment.  Not only did Dr. Khuri fail to document the scope

and focus of his file review, but he appears to have seized on a single treating physician's

suggestion of surgery as an option, while disregarding the substantial record of treatment

alternatives offered to and pursued by Plaintiff.  Dr. Khuri's evaluation indicates that he

understood Plaintiff to be totally disabled, yet only temporarily so, insofar as he had

refused surgery.  There is simply nothing in the Plan's definition of "total and permanent"

23

disability which would mandate that a claimant pursue *every* treatment option proposed by a doctor—including potentially risky or invasive treatments—before being ultimately deemed disabled.  Conditioning benefits on possible prospective treatment is particularly inappropriate in this case, where Plaintiff has clearly sought other avenues of treatment to alleviate his symptoms and where there is no indication that he has otherwise failed to follow his doctors' recommendations.

Ultimately, this is a close case.  The Court cannot say that Plaintiff was definitively entitled to disability retirement benefits, in that his condition was clearly permanent or "reasonably expected to continue for at least 60 additional months" under the terms of the Plan.  However, the Court is concerned with the integrity of the claim review process in light of the Plan's adoption of its examiners' cursory evaluations.  The Plan simply did not provide sufficient basis for its conclusion that Plaintiff's conditions were "treatable," beyond Dr. Conibear's conclusory statements that treatment could reasonably be expected to result in improvement and Dr. Khuri's even more problematic assertion that *with surgery* Plaintiff will be able to resume gainful employment. Accordingly, the Court finds that the decision to terminate benefits was not the result of a deliberate, principled reasoning process, but rather ignored or minimized relevant medical information in Plaintiff's favor without explaining rationally why that information must be discounted.  See Elliott v. Metropolitan Life Ins. Co., 473 F.3d 613, 622 (6th Cir. 2006).  As a result, the Court holds that the Plan's denial of Plaintiff's benefits was "arbitrary and capricious."

24

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion to reverse the administrator's decision is GRANTED.  IT IS FURTHER ORDERED that Defendant's motion for entry of judgment affirming the plan administrator's decision is DENIED, and that this case be REMANDED to USG Corporation Retirement Plan for a full and fair review of Plaintiff's disability retirement benefits claim.[6]


s/Gerald E. Rosen
Gerald E. Rosen
Chief, United States District Judge


Dated: September 11, 2009

---

[6]  As noted above, the Social Security Administration determined that Plaintiff was disabled after the Committee denied Plaintiff's disability retirement benefits.  The SSA's findings were therefore not a part of the administrative record.  The SSA's determination may be instructive to the Plan administrator on remand and the Plan is encouraged to consider any factual findings or any other information that would permit it to conduct a full and fair review of Plaintiff's claim.

The Court does not hold that the Plan administrator is *required* to consider the SSA's findings.  As the Sixth Circuit explained in an unpublished opinion, it would be illogical to require a plan administrator to consider *new evidence* before the Court can determine whether the *original outcome* was reasonably reached based on the old evidence.  Seiser v. UNUM Provident Corp., No. 04-1177, 135 Fed. Appx. 794, 799 (6th Cir. April 22, 2005).  Moreover, the SSA's determination that Plaintiff was disabled does not bind the Plan, nor does it impose some heightened duty on the Plan administrator to explain why it reached a different result than the SSA.  See Creech v. UNUM Life Ins. Co. of North America, No. 05-5074, 162 Fed. Appx. 445, 454 (6th Cir. Jan. 9, 2006).

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 12, 2009, by electronic and/or ordinary mail.

s/Ruth A. Brissaud
Case Manager
(313) 234-5137